(Nos. 41730, 41739 cons.—)

JACK SPRING, INC., Appellee, v. EMMA LITTLE, Appellant.—SUTTON & PETERSON, INC., Appellee, v. ZELETA PRICE, Appellant.

*Opinion filed January 28, 1972.*

RYAN, J., also dissenting.

KLEIMAN, CORNFIELD and FELDMAN, of Chicago (GILBERT A. CORNFIELD and BARBARA J. HILLMAN, of counsel,) for appellant.

IRVING GOODMAN and NATHAN EINHORN, both of Chicago, for appellee Sutton and Peterson, Inc.

STEPHEN J. EPSTEIN, of Chicago, for appellee Jack Spring, Inc.

HARRY G. FINS, of Chicago, for *amicus curiae* Appellate Lawyers Association.

KIRKLAND, ELLIS, HODSON, CHAFFETZ & MASTERS, of Chicago, (VERNON M. WELSH and FRANK L. WINTERS, of counsel,) for *amicus curiae* Chicago Real Estate Board.

Mr. JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendants Emma Little and Zeleta Price appeal from judgments of the circuit court of Cook County awarding plaintiffs Jack Spring, Inc. and Sutton & Peterson, Inc. respectively, possession of premises described as "3901 West Jackson 3rd floor," and "a three room apartment on the second floor of premises located at 7804 Prairie," both in Chicago. Because of the similarity of the issues involved we ordered the appeals consolidated for argument and opinion.

In the action against defendant Little, the complaint

alleged that rent for the premises for a period of two months was due and owing, that there was due plaintiff from defendant for such rental the sum of $270, and that plaintiff claims possession of the property and $270 "as rent or damages." It is not apparent from the record when or if the complaint was amended, but the judgment entered, and from which defendant Little appeals, is for possession of the premises only. In the action against defendant Price the complaint alleged that defendant unlawfully withheld possession of the premises and did not allege any failure to pay rent. The parties however, state in their briefs that plaintiff's claim to possession was based on defendant Price's failure to pay rent.

In her verified answer, as amended, defendant Little denied the allegations of the complaint and in four counts pleaded affirmative defenses. She alleged the existence of an "oral lease;" plaintiff Jack Spring, Inc.'s promises, and the breach thereof, to make certain repairs; many structural defects which are violations of enumerated sections of the Municipal Code of Chicago; plaintiff's wilful neglect and intentional refusal to repair them, and that plaintiff, by reason of said refusal, was "in violation of an implied covenant of habitability;" the filing of a suit by the building department of the city of Chicago against the owner of record of the premises to enforce the building code; that she had sought other housing through private sources and governmental agencies and had been unable to find suitable housing; that the Cook County Department of Public Aid was withholding payments of rent for welfare recipients who occupied apartments in the building, that plaintiff cannot sue for possession of the premises occupied by such welfare recipients (see Ill. Rev. Stat. 1969, ch. 23, par. 11—23), and that to permit judgment to be entered against her for possession of the premises because she was employed and not a welfare recipient would violate her rights under the fourteenth amendment to the constitution of the United States.

She further alleged that the enforcement of plaintiff's "illegal and unconstitutional" claim to possession will assist in perpetuation of slum housing, and will result in injury and detriment to defendant and other Negro citizens forced to occupy and reside in such slum housing.

In her verified answer, defendant Price denied the allegations of the complaint and, as affirmative defenses alleged the existence of a written lease, plaintiff's promise, and the breach thereof, to make certain repairs, and repeated complaints to the appropriate agencies of the city of Chicago and their failure to institute action to enforce compliance by plaintiff with enumerated provisions of the Municipal Code of Chicago. She also alleged that enforcement of certain provisions of the lease would violate the public policy of Illinois and deprive her of certain fourteenth amendment rights.

The circuit court allowed plaintiffs' motions to strike the answers and entered judgments for possession.

Upon entry of judgment and filing of notice of appeal each defendant moved in the circuit court for waiver of an appeal bond and supported the motion with an affidavit showing inability, by reason of poverty, to furnish bond. In each instance the motion was denied, and the court set the amount of the appeal bonds at $2,000 for defendant Little, and $1,200 for defendant Price.

The first issue presented arises from plaintiffs' contention that the appeals must be dismissed because of defendants' failure to file appeal bonds within 5 days as required by section 18 of "An Act in regard to forcible entry and detainer" (hereafter called Forcible Entry and Detainer Act; Ill. Rev. Stat. 1969, ch. 57, par. 19). Defendants contend that under the constitution and statutes of Illinois, and the rules of this court, in no situation except forcible entry and detainer is furnishing of bond a prerequisite to an appeal. They argue further that the mandatory conditions of the bond prescribed by the Forcible Entry and Detainer Act deny defendants the right, enjoyed by appellants in other

types of cases, to have the conditions of the appeal bond fixed with reference to the character of the judgment as provided in our Rule 305(d). 43 Ill.2d R. 305.

Plaintiffs contend that this court, in a long line of cases, has *sub silentio* held section 18 to be constitutional. *Amicus curiae* Chicago Real Estate Board argues that equal protection does not require exact uniformity of procedure and cites authority approving shortened times for taking an appeal in certain types of cases. The parties have not cited, nor have we found, a case in which this court decided the question here presented, and obviously any alleged *sub silentio* holding in no way precludes our consideration of the issue.

Section 7 of article VI of the constitution of Illinois (1870) and section 6, article VI of the constitution of Illinois (1970) provide for an appeal, as a matter of right, from all final judgments of the circuit court. Having created the right of appeal, the statutes adopted and the rules promulgated in implementation of that right may not serve to discriminate against appellants by reason of the inability to furnish an appeal bond. (*Griffin v. Illinois* (1956), 351 U.S. 12, 100 L. Ed. 891, 76 S. Ct. 585; *Boddie v. Connecticut* (1971), 401 U.S. 371, 28 L. Ed. 2d 113, 91 S. Ct. 780; *Mayer v. City of Chicago* (1971), 404 U.S. 189, 30 L. Ed. 2d 372, 92 S. Ct. 410.) We hold, therefore, that insofar as section 18 of the Forcible Entry and Detainer Act requires the furnishing of bond as a prerequisite to prosecuting an appeal, it is violative of the fourteenth amendment to the constitution of the United States, of article II, section 2, and article VI, section 7, of the Illinois constitution of 1870, and article I, section 2, and article VI, section 6, of the Illinois constitution of 1970.

Defendants contend that the effect of the trial court's orders denying their motions for waiver of appeal bond and requiring them to furnish bonds conditioned as prescribed by section 19 of the Forcible Entry and Detainer Act (Ill. Rev. Stat. 1969, ch. 57, par. 20) is to make "the tenant's

right to an appeal turn on his wealth." They argue that if the statutes and rule (ch. 57, pars. 19 and 20; Supreme Court Rule 305) permit the requirement of such bonds "they are unconstitutional on their face," and in any event are unconstitutional as applied in these cases.

We find it unnecessary to decide whether section 19 of the Forcible Entry and Detainer Act is unconstitutional. The Civil Practice Act (Ill. Rev. Stat. 1969, ch. 110) governs actions brought under the Forcible Entry and Detainer Act (Ill. Rev. Stat. 1969, ch. 57, par. 11), and our rules govern appeals in those actions. Our Rule 303(b) provides: "(1) *Forcible Entry and Detainer*. The time and method of appeal in forcible entry and detainer cases shall be as provided by statute (Ill. Rev. Stat., ch. 57, par. 19 *et seq.*), and paragraph (e) of this rule is inapplicable to those cases," and in view of our holding section 18 invalid, to the extent that the rule purports to embody the provisions of that section, it is no longer operative. The stay of judgments pending appeal is governed by our Rule 305 and its provisions supersede those contained in section 19 of the Forcible Entry and Detainer Act. The right to an appeal is a matter separate and apart from the right to *supersedeas* during the pendency of the appeal, and in being required to furnish a bond as a condition to staying the judgment, an appellant in an action in Forcible Entry and Detainer is in no different situation than an appellant who seeks a stay of the judgment in any other type of appeal.

This court, upon application of the defendants, granted *supersedeas* conditioned, *inter alia,* upon the payment of rental installments as they became due. *Amicus curiae* Chicago Real Estate Board and plaintiffs argue that this type of "use and occupancy bonds" in many cases cannot protect the landlord's interests, and the additional coverage provided by a bond of the type contemplated by section 19 of the Forcible Entry and Detainer Act is essential to protect the premises occupied, the landlord and other tenants. In our opinion this type of bond is within the contemplation

of Rule 305, and the motions to dismiss the appeals are denied.

Defendants contend the trial court erred in striking their affirmative defenses, thus refusing to permit them to raise the plaintiffs' prior breach of their obligation to maintain the premises as a condition to their right to possession. They argue that the obligation to pay "full rent" under a lease is interdependent with the landlord's obligation to maintain and repair the premises, that summary eviction in face of the landlord's failure to maintain the premises is contrary to principles of equity, and that summary eviction based upon an "unconscionable lease" is violative of defendants' constitutional rights.

Plaintiffs contend the only issue in a forcible detainer action is the right to possession, and no equitable defenses can be recognized. Citing *Rubens* v. *Hill*, 213 Ill. 523, and *Automobile Supply Co.* v. *The Scene-In-Action Corp.*, 340 Ill. 196, the Chicago Real Estate Board argues that "under well settled Illinois law no implied covenant to repair is imposed on a landlord, a covenant to pay rent is independent of a covenant to repair and a breach of a covenant to repair is not a germane defense in a forcible detainer suit based on non-payment of rent." Plaintiffs and *amicus curiae* contend further that defendants seek in this action "far-reaching changes in long established landlord-tenant law; such request is appropriate for legislative rather than judicial consideration."

The resolution of the issue presented requires an examination of section 5 of the Forcible Entry and Detainer Act.

Section 5 as enacted in 1874 provided that upon filing in a justice of the peace court or a court of record of a complaint in writing by the party entitled to possession of premises described in the complaint, stating he was entitled to possession and that a defendant named in the complaint was unlawfully withholding possession, summons was to issue. In 1935 (Laws of 1935, pp. 891, 892) the following

provision was added: "No matters not germane to the distinctive purpose of the proceeding shall be introduced by joinder, counterclaim or otherwise." In 1937 (Laws of 1937, p. 611) the following provision was added: *"Provided, however, that a claim for rent may be joined in the complaint, and judgment obtained for the amount of rent found due."* In 1965 (Laws of 1965, p. 51) a further amendment deleted the references to justices of the peace and courts of record and provided for the filing of the complaint in the circuit court for the county where such premises are situated. At the time of the enactment of the 1935 amendment the sole remedy available under the Act, and therefore the "distinctive purpose" of any proceeding based thereon, was recovery of the premises. Upon enactment of the 1937 amendment with its provision for recovery of rent, the proceeding, to some extent, lost its distinctive purpose. To hold that a landlord, at his option, may expand the issues in a proceeding brought under the statute and the tenant may not is violative of common sense and accepted rules of statutory interpretation.

Section 2 of the Forcible Entry and Detainer Act provides that one entitled to the possession of lands may be restored thereto under this Act when, *inter alia,* "a peaceable entry is made and the possession unlawfully withheld." In these cases there is no question that when defendants, in one instance under an oral agreement, and in the other under a written lease, entered upon possession of the premises, they were peaceable entries, and unless, as claimed by plaintiffs, rent is due and remains unpaid, possession is not "unlawfully withheld." It is apparent, therefore, that even though the plaintiffs do not seek to recover rent in these actions, the question of whether rent is due and owing is not only germane, but in these cases where the right to possession is asserted solely by reason of nonpayment, is the crucial and decisive issue for determination.

We have stated above the respective contentions of the parties. With respect to plaintiffs' first contention that the

only issue in a forcible detainer action is the right to possession and no equitable defenses can be recognized, *Rosewood Corp.* v. *Fisher,* 46 Ill.2d 249, holds to the contrary.

It is established law that liability for rent continues so long as the tenant is in possession and equally well established that a tenant may bring an action against his landlord for breach of a covenant or may recoup for damages in an action brought to recover rent. *Rubens* v. *Hill,* 213 Ill. 523, 534; *Selz* v. *Stafford,* 284 Ill. 610, 617.

The salutary trend toward determination of the rights and liabilities of litigants in one, rather than multiple proceedings, is demonstrated by our opinions in *Miller* v. *DeWitt,* 37 Ill.2d 273, and *Muhlbauer* v. *Kruzel,* 39 Ill.2d 226. It would be paradoxical, indeed, to hold that if these were actions to recover sums owed for rent the defendants would be permitted to prove that damages suffered as the result of the plaintiffs' breach of warranty equalled or exceeded the rent claimed to be due, and therefore, that no rent was owed, and at the same time hold that because the plaintiffs seek possession of the premises, to which admittedly, they are not entitled unless rent is due and unpaid after demand, the defendants are precluded from proving that because of the breach of warranty no rent is in fact owed. The argument that the landlords' claim is for rent and the tenants' for damages should not be permitted to obfuscate the sole and decisive issue, which simply stated is whether the tenants owe the landlords rent which is due and remains unpaid.

Insofar as defendants' affirmative defenses alleged the breach of express covenants to repair, they were germane to the issue of whether the defendants were indebted to plaintiffs for rent and we find no impediment in our earlier opinions to the determination of the issue in one rather than multiple actions. We hold, therefore, that the trial court erred in striking these affirmative defenses.

We consider now whether the answers allege the existence of implied warranties or covenants and the breach

thereof, and if so, whether the matters pleaded were "germane to the distinctive purpose of the proceeding."

Plaintiffs and *amicus curiae* Chicago Real Estate Board argue that there is no implied covenant to repair imposed on a landlord, and therefore, no implied warranty of habitability. The concept of an implied warranty of habitability is no stranger to the common law.

In *Ingalls* v. *Hobbs* (1892), 156 Mass. 348, at 349-350, 31 N.E. 286, at 286-287, the Supreme Judicial Court of Massachusetts said:

"It is well settled, both in this commonwealth and in England, that one who lets an unfurnished building to be occupied as a dwelling house does not impliedly agree that it is fit for habitation. *Dutton* v. *Gerrish,* 9 Cush. 89. *Foster* v. *Peyser,* 9 Cush. 242. *Stevens* v. *Pierce,* 151 Mass. 207. *Sutton* v. *Temple,* 12 M. & W. 52. *Hart* v. *Windsor,* 12 M. & W. 68. In the absence of fraud or a covenant, the purchaser of real estate, or the hirer of it for a term however short, takes it as it is, and determines for himself whether it will serve the purpose for which he wants it. He may, and often does, contemplate making extensive repairs upon it to adapt it to his wants. But there are good reasons why a different rule should apply to one who hires a furnished room or a furnished house for a few days or a few weeks or months. Its fitness for immediate use of a particular kind, as indicated by its appointments, is a far more important element entering into the contract than when there is a mere lease of real estate. One who lets for a short term a house provided with all furnishings and appointments for immediate residence may be supposed to contract in reference to a well understood purpose of the hirer to use it as a habitation. An important part of what the hirer pays for is the opportunity to enjoy it without delay, and without the expense of preparing it for use. It is very difficult, and often impossible, for one to determine on

inspection whether the house and its appointments are fit for the use for which they are immediately wanted, and the doctrine *caveat emptor,* which is ordinarily applicable to a lessee of real estate, would often work injustice if applied to cases of this kind. It would be unreasonable to hold, under such circumstances, that the landlord does not impliedly agree that what he is letting is a house suitable for occupation in its condition at the time. This distinction betweeen furnished and unfurnished houses, in reference to the construction of contracts for letting them, when there are no express agreements about their condition, has long been recognized in England, where it is held that there is an implied contract that a furnished house let for a short time is in proper condition for immediate occupation as a dwelling. *Smith v. Marrable,* 11 M. & W. 5. *Wilson v. Hatton,* 2 Ex. D. 336. *Manchester Bonded Warehouse Co. v. Carr,* 5 C. P. D. 507. *Sutton v. Temple, ubi supra. Hart v. Windsor, ubi supra. Bird v. Lord Greville,* 1 C. & E., 317. *Charsley v. Jones,* 53 J. P. 280."

Insofar as the affirmative defenses allege implied warranties of compliance with the Chicago building code, we find the situation presented in *Schiro v. W. E. Gould & Co.,* 18 Ill.2d 538, to be analogous. In that case plaintiff had agreed to purchase certain real property on which defendants were to erect a house. Plaintiffs tendered the amount due on the purchase price and requested that the court order defendants to install a water and sewerage system in conformance with the Chicago building code. Defendants moved to strike the complaint, as amended, arguing that it failed to state a cause of action in that the contract contained no provision requiring that such a water and sewer system be installed. The trial court allowed the motion and dismissed the suit. In reversing the judgment this court said, at page 544-5:

"It is settled law that all contracts for the purchase and sale of realty are presumed to have been executed

in the light of existing law, and with reference to the applicable legal principles. [Citation.] Thus, the law existing at the time and place of the making of the contract is deemed a part of the contract, as though expressly referred to or incorporated in it. [Citations.]

"The rationale for this rule is that the parties to the contract would have expressed that which the law implies 'had they not supposed that it was unnecessary to speak of it because the law provided for it.' [Citation.] Consequently, the courts, in construing the existing law as part of the express contract, are not reading into the contract provisions different from those expressed and intended by the parties, as defendants contend, but are merely construing the contract in accordance with the intent of the parties.

\* \* \*

"Applying this established law to the instant case, it is evident that the contract to purchase the land and building to be constructed by defendants included, as an integral part, the relevant provisions of the city code in existence at the time the contract was executed. The requirements of that code were, therefore, as much a part of the contract as if they had been enumerated by the parties."

In *Javins* v. *First National Realty Corp.* (1970), 428 F.2d 1071, the Court of Appeals for the District of Columbia discussed numerous authorities including *Ingalls* and *Schiro,* reviewed the development of the now prevailing rule that there are implied warranties of quality and fitness for their intended use in connection with the sale and rental of chattels, commented upon the cases in which builders have been held liable for improper construction of new homes on the ground that they had breached an implied warranty of fitness, or in some instances, an implied warranty that all local building regulations had been complied with, and then at pages 1076-1078 said:

"Despite this trend in the sale of real estate, many courts have been unwilling to imply warranties of quality, specifically a warranty of habitability, into leases of apartments. Recent decisions have offered no convincing explanation for their refusal; rather they have relied without discussion upon the old common law rule that the lessor is not obligated to repair unless he covenants to do so in the written lease contract. However, the Supreme Courts of at least two states, in recent and well reasoned opinions, have held landlords to implied warranties of quality in housing leases. [Citations.] In our judgment, the old no-repair rule cannot coexist with the obligations imposed on the landlord by a typical modern housing code, and must be abandoned in favor of an implied warranty of habitability. In the District of Columbia, the standards of this warrranty are set out in the Housing Regulations.

"A. In our judgment the common law itself must recognize the landlord's obligation to keep his premises in a habitable condition. This conclusion is compelled by three separate considerations. First, we believe that the old rule was based on certain factual assumptions which are no longer true; on its own terms, it can no longer be justified. Second, we believe that the consumer protection cases discussed above require that the old rule be abandoned in order to bring residential landlord-tenant law into harmony with the principles on which those cases rest. Third, we think that the nature of today's urban housing market also dictates abandonment of the old rule.

"The common law rule absolving the lessor of all obligation to repair originated in the early Middle Ages. Such a rule was perhaps well suited to an agrarian economy; the land was more important than whatever small living structure was included in the leasehold, and the tenant farmer was fully capable of making repairs himself. These historical facts were the basis on which the common law constructed its rule; they also pro-

vided the necessary prerequisites for its application.

"Court decisions in the late 1800's began to recognize that the factual assumptions of the common law were no longer accurate in some cases. For example, the common law, since it assumed that the land was the most important part of the leasehold, required a tenant to pay rent even if any building on the land was destroyed. Faced with such a rule and the ludicrous results it produced, in 1863 the New York Court of Appeals declined to hold that an upper story tenant was obliged to continue paying rent after his apartment building burned down. The court simply pointed out that the urban tenant had no interest in the land, only in the attached building."

Citing and quoting from *Ingalls* the Court of Appeals then went on to say at pages 1078-1079:

"These as well as other similar cases demonstrate that some courts began some time ago to question the common law's assumptions that the land was the most important feature of a leasehold and that the tenant could feasibly make any necessary repairs himself. Where those assumptions no longer reflect contemporary housing patterns, the courts have created exceptions to the general rule that landlords have no duty to keep their premises in repair.

"It is overdue for courts to admit that these assumptions are no longer true with regard to all urban housing. Today's urban tenants, the vast majority of whom live in multiple dwelling houses, are interested, not in the land, but solely in 'a house suitable for occupation.' Furthermore, today's city dweller usually has a single, specialized skill unrelated to maintenance work; he is unable to make repairs like the 'jack-of-all-trades' farmer who was the common law's model of the lessee. Further, unlike his agrarian predecessor who often remained on one piece of land for his entire life, urban tenants today are more mobile than ever before. A tenant's tenure in a specific apartment will often not be sufficient to justify efforts at

repairs. In addition, the increasing complexity of today's dwellings renders them much more difficult to repair than the structures of earlier times. In a multiple dwelling repair may require access to equipment and areas in the control of the landlord. Low and middle income tenants, even if they were interested in making repairs, would be unable to obtain any financing for major repairs since they have no long-term interest in the property.

"Our approach to the common law of landlord and tenant ought to be aided by principles derived from the consumer protection cases referred to above. In a lease contract, a tenant seeks to purchase from his landlord shelter for a specified period of time. The landlord sells housing as a commercial businessman and has much greater opportunity, incentive and capacity to inspect and maintain the condition of his building. Moreover, the tenant must rely upon the skill and *bona fides* of his landlord at least as much as a car buyer must rely upon the car manufacturer. In dealing with major problems, such as heating, plumbing, electrical or structural defects, the tenant's position corresponds precisely with 'the ordinary consumer who cannot be expected to have the knowledge or capacity or even the opportunity to make adequate inspection of mechanical instrumentalities, like automobiles, and to decide for himself whether they are reasonably fit for the designed purpose.' [Citations.]

"Since a lease contract specifies a particular period of time during which the tenant has a right to use his apartment for shelter, he may legitimately expect that the apartment will be fit for habitation for the time period for which it is rented. We point out that in the present cases there is no allegation that appellants' apartments were in poor condition or in violation of the housing code at the commencement of the leases. Since the lessees continue to pay the same rent, they were entitled to expect that the landlord would continue to keep the premises in their beginning condition during the lease term. It is pre-

cisely such expectations that the law now recognizes as deserving of formal, legal protection."

We find the reasoning in *Javins* persuasive and we hold that included in the contracts, both oral and written, governing the tenancies of the defendants in the multiple unit dwellings occupied by them, is an implied warranty of habitability which is fulfilled by substantial compliance with the pertinent provisions of the Chicago building code. We hold further that the defendants' answers sufficiently plead the existence and breach of the implied warranties. The issues raised were germane to the decisive question of whether the defendants were indebted to plaintiffs for rent and the trial court erred in striking the affirmative defenses alleging breach of the implied warranty.

Finally, we consider the affirmative defense of defendant Price with respect to the paragraph in her lease which provides:

"CONDITION OF PREMISES—Lessee has examined said premises and appurtenances prior to and as a condition precedent to his acceptance and the execution hereof, and is satisfied with the physical condition thereof, and his taking possession shall be conclusive evidence of his receipt thereof in good order and repair, except as otherwise specified hereon, and agrees and admits that no representation as to condition or repair has been made by Lessor or his agent, which is not herein expressed, or endorsed hereon; and that no promise to decorate, alter, repair or improve, either before or at the execution hereof, not contained herein, has been made by Lessor or his agent."

Insofar as her affirmative defense presented the issue of whether the presence of this provision in the lease precluded the existence of an implied warranty of habitability and proof of the breach of the alleged express agreements to repair the premises, it was germane to the issue of whether rent was due and owing and the court erred in striking it.

We have considered the arguments of plaintiffs and the Chicago Real Estate Board that any change in the long established rules of landlord and tenant law should be effected by legislative action. Admittedly, the rules for which

they contend are the product of judicial decision, and we find particularly apposite the statement of Mr. Justice Cardozo that "A rule which in its origin was the creation of the courts themselves, and was supposed in the making to express the *mores* of the day, may be abrogated by courts when the *mores* have so changed that perpetuation of the rule would do violence to the social conscience. * * * This is not usurpation. It is not even innovation. It is the reservation for ourselves of the same power of creation that built up the common law through its exercise by the judges of the past." (The Growth of the Law, chap. IV, p. 136.) In that ambience, in recent years, this court decided *Nudd* v. *Matsoukas,* 7 Ill.2d 608, *People ex rel. Noren* v. *Dempsey,* 10 Ill.2d 288, *Molitor* v. *Kaneland Community Unit District,* 18 Ill.2d 11, and *Suvada* v. *White Motor Co.,* 32 Ill.2d 612.

At this stage, as did the Supreme Court in *Jones* v. *Alfred H. Mayer Co.* (1968), 392 U.S. 409, 20 L. Ed. 2d 1189, 88 S. Ct. 2186, we "make clear precisely what this case does not involve." It does not involve nor purport to adjudicate issues which might arise in an action based on notice given in accordance with any section of the Landlord and Tenant Act (Ill. Rev. Stat. 1969, ch. 80) except section 8, which is here specifically involved. It does not alter the long established rule that liability for rent continues so long as the tenant retains possession of the premises (*Automobile Supply Co.* v. *The Scene-In-Action Corp.,* 340 Ill. 196), and is applicable only to the factual situations here presented, the occupancy of multiple dwelling units.

For the reasons set forth the judgments of the circuit court of Cook County are reversed and the causes remanded for proceedings not inconsistent with this opinion.

*Reversed and remanded.*

Mr. JUSTICE KLUCZYNSKI, dissenting:

Initially, I would dispel any inference that a claim for rent due was involved in this combined appeal. The record

discloses that the prayer for a rent judgment in the *Little* complaint was dismissed in the trial court and as specifically stated in the *Little* brief: "This case comes before the Supreme Court on appeal from a judgment and writ of restitution entered against Defendant tenant pursuant to a forcible detainer action for possession only of leased premises based solely upon an allegation of non-payment of rent due under an oral lease." Nor was rent involved in the *Price* complaint. Therefore, I believe, no matters of "joinder, counterclaim or otherwise" were germane to the distinctive purpose of these proceedings—the sole right to possession of the premises.

The majority opinion destroys the summary purpose and aspect of the Forcible Entry and Detainer Act and defeats the legislative intent expressed therein. The defendants even admit that there "is a persuasive assumption that a landlord is simply not contractually bound to repair or maintain leased premises, by any standard, unless the landlord has expressly agreed to do so by written covenants," citing *Gibbons* v. *Hoefeld*, 299 Ill. 455, and *Moldenhauer* v. *Krynski*, 62 Ill. App. 2d 382. This principle holds doubly true in the case of the *Price* appeal since paragraph 3 of their lease includes an express disclaimer of any promise to repair. Accordingly even if there were some covenant which the law implied when there is no lease provision otherwise, the principle applies, as set forth in *Rubens* v. *Hill*, 213 Ill. 523.

At common law the tenant became the possessory owner of an estate for a period of time and during that term the primary indicia of ownership passed to him. (1 *American Law of Property*, sec. 3.38.) Thus it became the duty of the tenant to make repairs to the let property and also maintain his obligation to pay rent. Accordingly, the rule developed that in the absence of a covenant to repair, the landlord owed his tenant no duty of maintenance. Furthermore, even where an express covenant to repair by the lessor is given, the usual construction is that the covenants

of the lessor and lessee are independent, so that the lessee may not treat the lessor's failure to repair as a basis for stopping rent payments. (1 *American Law of Property,* sec. 3.79; *Truman* v. *Rodesch,* 168 Ill. App. 304; *Geiger* v. *Brown,* 167 Ill. App. 534.) Thus, at common law, the breach by the landlord of his express covenant to repair can in no way be construed an available defense to a defaulting tenant in a suit merely determining the right of possession.

In *Truman,* the lessee refused to pay rent and continued to occupy the premises; when the landlord sued for possession under the Forcible Entry and Detainer Act, the lessee claimed breach of the landlord's promise to adequately heat the premises. In rejecting the defense, the court said (168 Ill. App. at p. 306) :

"* * * Defendant takes the position that if his damages exceeded the rent due, then he was in fact not in default and there was no rent due, and therefore this suit could not be maintained. With this contention we do not agree. The covenant to pay rent was not upon condition that plaintiff comfortably heat said premises, but was a separate and independent covenant; and when he failed to perform it, the landlord had the right, after notice and demand, to declare the lease forfeited, and to sue for possession. 'The whole question in actions of this nature is, does the defendant unlawfully withhold possession of the premises sought to be recovered in the action.' *Woodbury* v. *Ryel,* 128 Ill. App. 459.

"If this was an action for recovery of the rent, a different question would be presented. Appellant argues that he should have been permitted to make said defense, on the grounds that it would prevent a multiplicity of suits, which is favored in law, but the legislature of this and many other states has seen fit to provide this summary proceeding solely for obtaining possession of real estate, regardless of the question of the amount of rent due or damages sustained. This act has been in existence too many years, and our

courts have dealt with it too long, for us now to declare it ineffectual for the purpose intended.

"The law is well settled in this and other states, that the tenant cannot prove his damages suffered because of the failure or neglect of the landlord to perform an independent covenant on his part, in an action solely for possession. *Peterson* v. *Kreuger,* 70 N.W. Rep. 567, (67 Minn. 449); *Mark* v. *Shumann Piano Co.,* 208 Ill. 282; *McSloy* v. *Ryan, 27* Mich. 109."

This has been the law until the majority here chose to abrogate it.

The majority seeks support in an extensive quote from the 1892 case of *Ingalls* v. *Hobbs,* 156 Mass. 348, 31 N.E. 286. This was an action to recover $500 for the use and occupation of a furnished dwelling during one summer period. The court there concluded by saying: "We are of opinion that in a lease of a completely furnished dwelling house for a single season at a summer watering place, there is an implied agreement that the house is fit for habitation without greater preparation than one hiring it for a short time might reasonably be expected to make in appropriating it to the use for which it was designed." In *Gade* v. *National Creamery Company* (1949), 324 Mass. 515, 518, 87 N.E.2d 180, 182, the Massachusetts court held that "In the ordinary lease of real estate there is no implied warranty that the premises are fit for occupancy or for the particular use contemplated by the lessee. The lessee takes the premises as he finds them. [Citations.] The plaintiff, however, contends that the present case comes within the exception to the general rule stated in *Ingalls* * * *. The principle of *Ingalls* v. *Hobbs,* although extended to include in the implied agreement the structural condition of the house, *Ackarey* v. *Carbonaro,* 320 Mass. 537, has been recognized as a departure from the general rule, *Hacker* v. *Nitschke,* 310 Mass. 754, and in its application has been limited to factual conditions similar to those on which the decision was based." And in a recent Massachusetts case, the (tort)

case of *Horton* v. *Marston* (1967), 352 Mass. 322, 326, 225 N.E.2d 311, 313, the court, after a review of similar cases, said: "We think that the length of the term in the case at bar [9 months] was not such as to place the risk of concealed defects on the tenant. Here, as in the *Ingalls* case, an 'important part of what the hirer * * * [paid for was] the opportunity to enjoy * * * [the dwelling] without delay, and without the expense of preparing it for use.' We hold that the defendant impliedly covenanted on September 4, 1962, that cottage No. 2 and its furnishings were then suitable for their intended use." The departure of *Ingalls* was again limited and I therefore find it an inappropriate support for the opinion of the majority. They argue principles which were expressed in *Schiro* v. *W. E. Gould & Co.*, 18 Ill.2d 538, an action involving a contract for purchase of land and a building to be constructed thereon by the sellers, where we held that such contract contemplated compliance with the city building code. These principles are clearly inapplicable to the facts of the instant case.

The opinion states that the rationale of our *Rosewood* decision applies here. (*Rosewood Corp.* v. *Fisher*, 46 Ill.2d 249.) It is not so. We specifically limited ourselves (at p. 255) to a consideration of the Act only so far as it applied to contract purchasers of land and said, quoting from *Bleck* v. *Cosgrove*, 32 Ill. App. 2d 267, 272, that: "Forcible entry and detainer is a summary statutory proceeding to adjudicate rights to possession and is unhampered and unimpeded by questions of title and other collateral matters not directly connected with the question of possession." We further held that "the defenses going to the validity and enforcibility of the contracts relied upon by the plaintiffs were germane to the distinctive purpose of the forcible entry and detainer actions and were improperly stricken." (46 Ill.2d 249, at 256.) And we further cautiously continued with: "Where as here, the right to possession a plaintiff seeks to assert has its source in an installment contract for the pur-

chase of real estate by the defendant, we believe it must necessarily follow that matters which go to the validity and enforcibility of that contract are germane, or relevant, to a determination of the right to possession." 46 Ill.2d 249, at 256-257.

The rule of law established by the opinion will do more harm than good. It will create a maze of practical problems of substantive and procedural nature, and will inundate the already understaffed metropolitan courts with a flood of protracted litigation. Numerous frivolous, trivial and spurious claims will unduly delay the termination of possessory rights in land and property.

The legislature is in a better position than this court to consider the problems involved and to determine any needed changes to these well settled common law and statutory doctrines. It did so by statutory enactment (Illinois Public Aid Code) regarding rent withholding in the case of public aid recipients through the determination of the Department of Public Aid. (Ill. Rev. Stat. 1969, ch. 23, par. 11—23.) Fundamentally it is the legislature's province to enact reforms and establish public policy for regulating the behavior and protecting the rights of all of the citizens. Illustrative of this, are the rent-withholding laws and regulatory statutes regarding landlord and tenant rights and housing codes enacted in our sister States. Here, the court has deliberately usurped the delegated powers of the people's representatives in the General Assembly and established a major change in the nature of long established rights regarding real estate and leaseholds. The trial court properly applied the law and its decision should have been affirmed.

Mr. CHIEF JUSTICE UNDERWOOD joins in this dissent.

Mr. JUSTICE RYAN, also dissenting:

I concur with that part of the majority opinion which deals with appeal bonds. Also, I do not disagree with the

necessity, as expressed by the majority, of moving from the strict principles of the common law concerning the landlord and tenant relationship to a position more responsive to the needs of present day situations. However, I disagree with the result reached by the majority and I do not believe that in order to achieve the desired results we need to design a concept called an "implied warranty of habitability" which as applied to the facts in this case I deem to be pure and simple legal fiction.

The concept of warranty of habitability has been used by courts in cases where the condition of the premises let were such as to render them uninhabitable and the courts have held that because of the condition of the premises the lessee was justified in vacating them and' was not bound by the conditions of the lease. (*Smith* v. *Marrable*, 152 Eng. Rep. 693 (Ex. 1843); *Pines* v. *Perssion* (1961), 14 Wis.2d 590, 111 N.W.2d 409; *Lemle* v. *Breeden* (1969), 51 Hawaii 426, 462 P.2d 470.) However, neither here nor in *Javins* v. *First National Realty Corp.* (D.C. cir. 1970), 428 F.2d 1071, is the condition of the premises at the beginning of the tenancy of concern. Both this case and *Javins* are concerned with the obligation of the owner to repair the premises covered by the lease. To arrive at a solution of this question it is unnecessary to expand the theory of warranty of habitability.

A lease is both a conveyance of an interest in real estate and a contract. (51c C.J.S., Landlord and Tenant, sec. 202 (1)(2)(3).) By virtue of the contractual aspect of the relationship between the lessor and the lessee, the lessor undertakes to perform certain covenants (express or implied), and in turn the lessee likewise undertakes to perform certain covenants (express or implied), including the covenant to pay rent. Covenants in leases are not necessarily mutual but will be considered as dependent or independent according to the intention of the parties. They are generally treated as independent in the absence of a clear indi-

cation to the contrary. (3 Thompson on Real Property (1959), sec. 1115.) Under the common-law rule the lessor had no duty to repair the premises in the absence of an express covenant to do so, and the express covenant to repair was generally considered to be independent of the lessee's covenant to pay rent. 3 Thompson on Real Property (1959), sec. 1115, p. 396.

However, there has been displayed with increasing frequency a tendency on the part of the courts to soften the harshness of the common law by applying to the construction of leases the guidelines applicable to the construction of contracts. (3 Thompson on Real Property (1959), p. 377; 6 Williston on Contracts, 3d ed. (Jaeger), sec. 890A (1962).) By giving consideration to the contract feature of the lease, the courts have in some cases construed leases as containing implied covenants by the lessor to repair the premises. In cases where a legislative body has made a policy judgment by enacting statutes or building codes which impose duties on the property owner, the courts have implied therefrom obligations of the lessor to repair and have construed the lease as containing an implied covenant by the lessor to repair the premises. *Marini* v. *Ireland* (1970), 56 N.J. 130, 265 A.2d 526; *Pines* v. *Perssion* (1961), 14 Wis.2d 590, 111 N.W.2d 409.

The housing code of the city of Chicago (Municipal Code of Chicago, pars. 78—11 through 78—20) imposes certain obligations upon an owner of dwelling units to repair and maintain the same. In keeping with this expression of legislative intent I would imply in every lease covering residential property within the purview of the housing code of the city of Chicago an implied covenant by the lessor to repair the premises in keeping with the requirements of the housing code. This court has held in *Schiro* v. *Gould & Co.* (1960), 18 Ill.2d 538, that the requirements of the city code are as much a part of the contract as if they had been enumerated by the parties. Under this authority such an implied covenant to repair is appropriate.

Possibly my preference for the use of the term "implied covenant" instead of "implied warranty of habitability" as used by the majority is only a matter of semantics. However, I prefer the covenant designation because it definitely indicates an obligation or an undertaking by the lessor as part of the lease itself. The term "warranty," however, generally carries with it the idea of a holding out or a representation thereby inducing another to act. (8 Williston on Contracts, 3d ed. (Jaeger), sec. 970.) Although the concept of a representation or an inducement may be appropriate in cases where the lessee has been justified in abandoning the premises because of its original condition, as in *Lemle* and *Pines,* to apply the term to a simple situation concerning repairs seems to be needlessly indulging in what may possibly be a confusing fiction.

The majority would extend their "warranty" only to multiple unit dwellings and would measure the extent of the warranty by substantial compliance with pertinent provisions of the code. Since the housing code of the city of Chicago applies to all dwellings and family units (Municipal Code of Chicago, pars. 78—11.1, 78—13) and imposes certain obligations to maintain and repair upon the owner of single-unit dwellings as well as multiple-unit dwellings, I fail to understand the reason for the distinction. Applying the accepted principles of contract law stated in *Schiro,* I would imply the full obligation to repair expressed by the housing code as a part of every lease of dwelling units covered by the code.

What then is the remedy of the lessee on the breach of covenant to repair? First, the tenant should have the right to rescind the contract and abandon the premises and be relieved from any further obligation under the lease. This is in the nature of the concept of constructive eviction. (3 Thompson on Real Property (1959), sec. 1132, pp. 491, 492, 493, and 496.) However, such a remedy offers little hope to the urban tenant of today who, because of poverty or lack of available housing, may in a sense be locked into

his unfortunate situation. For these reasons alternative relief must be designed. I think this relief can be afforded within the traditional rules of contract law in the following manner.

If the tenant elects not to treat the lease (contract) as rescinded and remains in the premises, his obligation to pay rent under the lease continues. A breach of a covenant to repair by the lessor does not absolve the tenant of his obligation to pay rent so long as he continues to occupy the premises. However, he should have the right to himself make the repairs which the lessor failed to perform and to offset against his obligation to pay rent the reasonable cost of the repairs which he has made. *Marini* v. *Ireland* (1970), 56 N.J. 130, 265 A.2d 526.

It must be acknowledged that the above alternative also may afford no relief to the tenant because of the prohibitive cost of the repairs or his inability to procure the same. Therefore a further option should be extended to the tenant. If the tenant continues to occupy the premises after the breach by the lessor of his obligation to repair, and if the tenant himself does not repair the premises, then he is liable for rent at a diminished amount, the amount of the reduction being measured by the difference in the rental value of the premises with the covenanted repairs and the rental value of the premises without them. 11 Williston on Contracts, 3d ed. (Jaeger), sec. 1404.

Looking now to the facts of the present case and accepting as true the allegations that the lessors in each of the cases consolidated herein breached their implied covenants to repair, are such allegations germane to the issues in a forcible detainer action? I agree with the majority that such allegations are germane to the question of whether any rent is in fact due to the lessor when the termination of the tenancy is based on the failure to pay rent. Had the tenant repaired the premises when the landlord made his demand for rent due (Ill. Rev. Stat. 1969, ch. 80, par. 8), the tenant could have tendered him the dif-

ference between the rent and the cost of repairs and exhibited a receipt for the repairs which he had made. If the landlord refused the amount so tendered and instituted the forcible detainer action, then the tenant could plead the breach of the covenant by the landlord, the making of the repairs by the tenant, and the cost of the same, and could tender the difference if the cost of the repairs were less than the rent due.

If the tenant does not make the repair, then upon the demand for rent being made (Ill. Rev. Stat. 1969, ch. 80, par. 8), and in order to prevent the termination of the tenancy, he must tender an amount of rent equal to the reasonable rental value of said premises in the unrepaired condition; and if this amount is refused by the landlord and a forcible detainer action instituted, the tenant should in his answer be permitted to plead the breach of the covenant to repair and the reduced rental value caused by the breach, and should tender the reasonable rental value of the premises.

In the cases now before us the tenants did not abandon the premises, they did not make the repairs and neither defendant has alleged that he was in any way damaged by the breach of the implied covenant to repair. In fact, not only does the defendant Price fail to allege any damages but he fails to ask for any offset or relief of any kind against the payment of rent and seeks only to force the plaintiff to comply with the alleged implied covenants to repair.

As to the defendant Little, she does not allege that she was in any way injured or damaged by the breach of the covenants; still she alleges that by virtue of the landlord's breach of these covenants she is entitled to damages and to offset such damages against rent. Such an allegation is not sufficient to sustain a claim for damages and was properly stricken by the court. (*Klatz* v. *Pfeffer* (1928), 333 Ill. 90, 15 I.L.P., Damages, p. 519; 25 C.J.S., Damages, sec. 130.) Obviously the premises had some rental value and absent some unusual damages flowing from the alleged

breach of the covenant there would not be a total setoff against the rent due. The answer alleges no such damages. Under the rationale of the majority opinion these allegations do not set forth anything germane to the question of whether any rent was in fact due to the plaintiffs.

The purpose of the affirmative allegations was not to secure relief from defendants' breach of a covenant to repair. The obvious reason for the failure to pay rent and the end which defendants seek to accomplish by the affirmative defenses is clearly apparent from an allegation found in both answers to the effect that the defendant has not refused to pay rent but is withholding rent until the plaintiff repairs the premises so as to render the same habitable and in compliance with the code. Such an allegation contains nothing germane to the question of whether any rent is due to the plaintiffs. In fact it constitutes an admission that rent is due.

Thus defendants have without legislative authority taken it upon themselves not only to determine under what conditions and when they will withhold their rent payments but also to withhold rent completely and indefinitely until compliance is had with the implied covenants. Section 11—23 of the Illinois Public Aid Code (Ill. Rev. Stat. 1969, ch. 23, par. 11—23) authorizes the withholding of rent on accommodations occupied by recipients of public aid in the event that the building containing the accommodations violates a housing code. However, the statute does not authorize an indefinite or total withholding of rent. If violations are corrected within a 90-day period, the statute provides that the total amount of the rent withheld shall be paid over to the landlord. If the violations are not corrected within the 90-day period, 20% of the rent withheld is assessed as a penalty and the balance is paid over to the landlord. A similar procedure is prescribed for each 30-day period following the initial 90-day withholding. Defendants' self-help scheme has gone far beyond the statutory program for

compelling the lessor to make repairs in dwellings occupied by public aid recipients.

In my opinion the defendants should seek some forum other than a forcible detainer action in which to compel compliance with the housing code. If rent withholding is an effective instrument to accomplish this end, then I suggest that legislative authorization be sought as in the case of welfare recipients.

Because of the failure of the answers to allege any damages flowing from the alleged breach of covenants to repair and because of the failure of the answers to disclose a willingness to pay any rent until the repairs have been made, it is my opinion that the trial court properly struck the affirmative allegations of the defendants' answers.